```
                                              Volume I
                                              Pages: 1-57
                                              Exhibits: 0
```

COMMONWEALTH OF MASSACHUSETTS

ESSEX, SS.                          PROBATE AND FAMILY
                                    COURT DEPARTMENT
                                    OF THE TRIAL COURT

```
*****************************
AMANDA DICRESCENZO              *
     Plaintiff                  *
                                *
v.                              *     DOCKET NUMBER ES16D0970JP
                                *
JAMES DICRESCENZO               *
     Defendant                  *
*****************************
                    HEARING
             BEFORE THE HONORABLE MARY R. BLACK
```

APPEARANCES:
For the Plaintiff:
31 Logden Court, Apartment 3D
Malden, Massachusetts  02148
By:  Amanda DiCrescenzo, Pro Se

For the Defendant:
The Law Offices of Regan Associates
45 School Street, 3rd Floor
Boston, Massachusetts  02108
By:  James Cullen, Esq.

```
                              Salem, Massachusetts
                              May 7, 2021
```

Recording produced by digital audio recording system. Transcript
produced by Approved Court Transcriber, Donna Holmes Dominguez

# I N D E X

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---------|--------|-------|----------|---------|
| None - Hearing | | | | |

1              **P R O C E E D I N G S**

2      (Court called to order.)

3              THE COURT:   Good morning.

4              MR. COHEN:   James --

5              THE COURT:   This is Judge Black in the Essex County

6      Probate and Family Court.   I'm calling for hearing the

7      DiCrescenzo matter, Docket Number 16D0970.

8              And I just want to make sure that Sessions Clerk Davis is

9      present.   Are you present?

10             THE CLERK:   I am, Judge.   I am, Judge.

11             THE COURT:   Thank you.

12             THE CLERK:   Good morning.

13             THE COURT:   Thank you.   Good morning.

14             I'm going to ask the parties to identify themselves,

15     beginning first with the mother.   Your name for the record,

16     ma'am.

17             THE PLAINTIFF:   Amanda DiCrescenzo.

18             THE COURT:   And are you appearing without the benefit of

19     counsel today?

20             THE PLAINTIFF:   Yes.

21             THE COURT:   And the father.   Please identify yourself.

22             THE DEFENDANT:   Yes, my name is James DiCrescenzo.

23             THE COURT:   And are you appearing with counsel or without

24     counsel today, sir?

25             THE DEFENDANT:   With counsel.

1   THE COURT:  And, counsel, your name for the record?

2   MR. CULLEN:  James Cullen, C-U-L-L-E-N.

3   THE COURT:  Thank you.  I'm going to indicate, as I may

4   have indicted to you previously, some protocols.  So I will

5   ask you to speak by identifying you by name.  If I don't do

6   that, please do not interrupt because it impacts the quality

7   of the recording.

8       I'm also going to ask you to speak a little slower and to

9   annunciate more than you might if you were present in the

10  courtroom together.  It is also important for you to make sure

11  that your background is free of other types of noise such as

12  televisions, music, etcetera.

13      And since this matter concerns children, I want the

14  assurance of the parties that the children are not present,

15  nor within earshot of this hearing.  Are you able to confirm

16  that, mother?

17  THE PLAINTIFF:  Yes, they are at my mother's house.

18  THE COURT:  Thank you.

19      And I'm going to ask the parties to raise their right

20  hands while I swear you in.

21                      **PARTIES, Sworn**

22  THE COURT:  So the Court had previously entered an order,

23  and then I had received approximately forty-seven exhibits

24  from, I believe it was the mother.  Is that correct, ma'am,

25  yes or no?

Attachment A.1.

1    THE PLAINTIFF:  Yes.  It was actually over fifty.

2    THE COURT:  All right.  Thank you.  So I did not request

3    the submission of any documentation at this hearing because it

4    is not an evidentiary hearing.  It is a review.  And so it

5    will be within my discretion whether or not I elect to address

6    any of those issues.

7        What I had hoped to do, was to review the order that had

8    entered on April 17th and to determine the current status of

9    those issues.  So I'm -- you'll have to bear with me, and I

10   ask your patience.  I'm accessing all of the documents

11   remotely through MassCourts, which sometimes takes a little

12   bit of time.  So what I'm going to do now is bring up the

13   order that I entered on April 17th, at Docket entry number 77.

14   Do you folks have that available?

15       THE PLAINTIFF:  Yes.

16       MR. CULLEN:  I do, Your Honor.  My client --

17       THE COURT:  All right.  So counsel, Attorney Cullen, you

18   have that available.  Ma'am, do you have that available?

19       THE PLAINTIFF:  Yes.

20       THE COURT:  Okay.  Just one moment, I'm going to access

21   it.  Just one moment.

22       All right.  So what I'd like to do is address paragraph

23   number one.

24       Has the parenting schedule been going as previously

25   implemented.  Beginning first with you, ma'am, yes or no?

1        THE PLAINTIFF:  No.

2        THE COURT:  What has not taken place?

3        THE PLAINTIFF:  Well I let James take the kids for a

4   couple of weeks because I wanted to see how it would work out

5   with a trial run because he's --

6        THE COURT:  Ma'am, I'm going to interrupt you.  There's a

7   tremendous amount of noise --

8        THE PLAINTIFF:  Feedback.  Yeah.

9        THE COURT:  Yes, so I want is --

10        THE PLAINTIFF:  Is this better?

11        THE COURT: -- all parties to do is to make sure that your

12   phone is on a flat surface in front of you, and on speaker.

13   That usually will decrease any of the interfering noise.

14   Because when you hold the phone, even slight movement causes

15   noise.  All right?

16        So, ma'am, what -- what's the previous parenting time

17   that the Court had ordered?

18        THE PLAINTIFF:  I'm sorry?

19        THE COURT:  What -- what --

20        THE PLAINTIFF:  That it would stay as is.

21        THE COURT:  And what was your understanding of what that

22   parenting time was?

23        THE PLAINTIFF:  That parenting time meant every other

24   weekend, the kids would go with James, and I would keep them

25   the rest of the time.

1      THE COURT:  But you elected to vary from that, and how

2    did you vary from that and when?

3      THE PLAINTIFF:  I -- the day after, I had -- you know, I

4    thought about it, and Ava has been, my oldest daughter, has

5    been wanting to see what it's like to live with her father,

6    and, you know, after thinking about it, you know, I was, like,

7    he wanted them until the trial date, that's about a couple of

8    weeks, so I decided, you know, since he wants them anyways, I

9    have been trying to get him to take the kids, that I'd give

10   her that opportunity to kind of see what it's like.  And plus

11   I wanted to also see what it would be like for him, you know,

12   to have the girls and how coparenting would be, and how my

13   interaction with him would be.  You know, this is, you know,

14   something that Ava has been asking for, because she wants to

15   see what it's like, and she hadn't really gotten to --

16     THE COURT:  But that -- ma'am, I'm just going to

17   interrupt you, and I may do that from time to time --

18     THE PLAINTIFF:  Sure.

19     THE COURT: -- with both parties, so I apologize.  But

20   that was not what the Court order was; is that correct, ma'am?

21     THE PLAINTIFF:  Right.

22     THE COURT:  The Court order was that the parties would

23   continue with the present parenting time.  So when did Ava and

24   the other child go to be with father, what date?

25     THE PLAINTIFF:  Well he had them on his regular weekend,

1    and -- had them on his regular weekend, which I believe was

2    April 17th through the 19th, and then on Tuesday -- the

3    following Tuesday, so he dropped them off on Sunday, on the

4    following Tuesday, he said he could take them for two weeks,

5    from Friday, April 24th to May 8th.

6        THE COURT:   And have you seen them during that time?

7        THE PLAINTIFF:   Nope.

8        THE COURT:   Has your boyfriend continued to reside at

9    your home?

10       THE PLAINTIFF:   No.

11       THE COURT:   When did he leave?

12       THE PLAINTIFF:   Before this date.

13       THE COURT:   What date?

14       THE PLAINTIFF:   I believe it was around 4 what 13, April

15   13th, around.

16       THE COURT:   All right.   And moving down to the other

17   aspects of the order that I entered, what action did you take

18   to communicate with the Department of Children and Families

19   relative to --

20       THE PLAINTIFF:   I've actually -- sure.   I'm sorry.

21       THE COURT:   Go ahead.   No, that's fine.

22       THE PLAINTIFF:   I've actually -- I've actually

23   communicated --

24       THE COURT:   Tell me what you did.

25       THE PLAINTIFF:   -- with them quite a bit.   They set me up

1    with therapy, and the girls with therapy, and it's this

2    therapy so that way they can see what it's like living in the

3    home, so they see, like, every single aspect of your life and,

4    you know, make recommendations accordingly.  So, you know, I'm

5    -- you know, I'm actually really looking forward to this, and

6    we already have two therapy appointments set up I believe,

7    it's the 12th and one is for the 18th, I believe.  And I think

8    we have one more to set up.

9        THE COURT:  And what about -- thank you.  And what about

10   providing the Department of Children and Families with the

11   ability to view your home as I had indicted in paragraph six?

12       THE PLAINTIFF:  Oh, yes, they did.  I believe it was

13   Chelsea, and I also gave her all the dental information and,

14   you know, she's -- the pediatrician -- you know, they have the

15   pediatrician's information.  Ava needs her, you know, regular

16   -- you know, just needs her regular physical exam, but they're

17   all updated on that.  But that's annual and that just took

18   place, so I'm all, you know, caught up -- caught up in that,

19   and they have the dentist information and so doesn't James.

20       THE COURT:  All right.  And what steps have you taken to

21   complete the parenting class?

22       THE PLAINTIFF:  I -- to be moving forward, it was a Zoom

23   meeting parenting class.

24       THE COURT:  All right.  And is that -- has that been

25   scheduled?

1      THE PLAINTIFF:  Yes.

2      THE COURT:  All right.  And when is it scheduled?

3      THE PLAINTIFF:  It was -- it happened on May 1st and May

4  2nd.

5      THE COURT:  All right.  And did you find that helpful?

6      THE PLAINTIFF:  Yeah, kind of.  You know, I remember the

7  information from the original one, but, you know, it was good

8  reminders.

9      THE COURT:  And did you have the ability to access and

10  review the Open Letter that the Chief Justice of the Probate &

11  Family Court had issues as I instructed in paragraph thirteen?

12      THE PLAINTIFF:  Yes, I reviewed it a little bit, you

13  know, after you gave it to us, and I also reviewed it again

14  this morning.

15      THE COURT:  All right.  And so this was set up for a

16  review.  So what, briefly, do you want me to know today?

17      THE PLAINTIFF:  About the, you know, the suggested

18  visitation or the modification, you know, I --

19      THE COURT:  Well today is just a review of this order.

20  So what would you like to see happen today, ma'am?

21      THE PLAINTIFF:  I would actually like, you know, I -- I

22  think -- a couple of things.  I would like to see James get

23  evaluated.  Based on what happened in the past two weeks, I

24  didn't get to talk to my kids and he kept them from me.  He

25  put them -- he gave them -- you know, he had a babysitter

1    watch them from I believe Monday through Friday, and during

2    that time, I didn't, you know, from Tuesday to Thursday, I

3    didn't even know where my children were.  I didn't find out

4    until Friday.  And I was sick about it.  I cried and I was

5    sick about it every single day, not knowing where my children

6    were.  I told him he could have them if I could Facetime them

7    once a day, and he kept me from them, and that scares me

8    because, you know, I want's best for my kids, and if that

9    means living with their father, I'm completely okay with that.

10   Like, I don't even know why we're having this Court date

11   because he didn't even come to me and ask me first.  And every

12   single time I've asked him, do you want to take the kids.  Ava

13   wants to move in with you.  What are your thoughts on that?

14   Over and over, he's denied it, but, yet he only wants it if

15   it's in Court.  So I'm not --

16        THE COURT:  Okay.  I'm going to -- I'm going to interrupt

17   you, ma'am, because I believe I understand your position.

18        THE PLAINTIFF:  Yeah.

19        THE COURT:  Now, counsel, I want to know what your client

20   has done to comply with the terms of my order.

21        MR. CULLEN:  So my client had previously done the

22   parenting education class, so he had already completed that.

23   He had reviewed --

24        THE COURT:  When did he complete that?

25        MR. CULLEN:  James, do you have the date?  I don't have

1    the certificate in front of me right now.

2       THE DEFENDANT:  Well, I -- I completed that back in

3    April.  I don't have the certificate in front of me as well.

4    I emailed that to you.  Sorry, I don't have it in front --

5       THE COURT:  How was it completed, sir?   How did you

6    complete it?

7       THE DEFENDANT:  I completed that through (inaudible at

8    12:22:13, low audio) online.

9       THE COURT:  All right.  And tell me, did -- counsel, did

10   you receive information from the Department of Children and

11   Families relative to mother's home?

12      MR. CULLEN:  I -- they weren't able to show me any video,

13   but I did speak with them, and they did confirm that the house

14   did appear to be tidy.  And they also confirmed, as you would

15   understand, that they had been in touch with mother.

16      THE COURT:  All right.  And what do you want me to know

17   about the current parenting, and the allegations that the

18   mother has made that your client has not permitted access to

19   the children?

20      MR. CULLEN:  We would deny it.  Mother has texted --

21      THE COURT:  How specifically, counsel?  Have the children

22   seen the mother since they have been with the father?

23      MR. CULLEN:  It's my -- they have had -- mother is

24   correct, there has been no physical parenting time.  They have

25   Facetimed with the children is my understanding.  And that's

1    correct, James?

2         THE DEFENDANT:  Yes.  That's correct.

3         They've had Facetime every single day since they have

4    been with me.  It's -- so the babysitter -- the babysitter

5    didn't want the mother having contact with them.

6         THE COURT:  So just one moment.  Just one moment, sir.

7         So, counsel, do I understand it that -- excuse me, your

8    client permitted a third party, the babysitter, to make the

9    election as to whether the children would have access to the

10   mother?

11        MR. CULLEN:  That does -- that does appear to be the

12   case, Your Honor.

13        THE COURT:  And the babysitter I understand was with the

14   mother Monday through Friday -- the babysitter was with the

15   children Monday through Friday during what -- during what

16   hours?

17        MR. CULLEN:  James, it was last week; correct?  Monday

18   through Friday?

19        THE DEFENDANT:  Yes, it was -- it was during pretty much

20   overnight, and the reasons I had a babysitter was because the

21   mother refused the day camp that DCF was willing to provide

22   me, and so she -- so she -- so -- so, yes, that -- so the

23   mother was adamant about the children not going to day camp,

24   so she insisted that I get a babysitter, and I didn't have

25   many babysitters, so I could only use the babysitters the few

1      that I have, and they all requested that Mandy not contact

2      them because of her behavior.

3          THE COURT:  So what is the -- I'm confused.  When was the

4      babysitters with the children, overnight for the whole week?

5          THE DEFENDANT:  Yes.

6          THE COURT:  What are your -- what are your working hours,

7      sir, that require that?

8          THE DEFENDANT:  So my (inaudible at 12:25:20, low audio.)

9          THE COURT:  Say that again, please?

10         THE DEFENDANT:  So what was the question?

11         THE COURT:  What I'm trying to understand, maybe the

12     easiest way is for you to tell me on each day, Monday through

13     Friday, the timeframes that the babysitter was with the

14     children.  Why don't we do that.

15         THE DEFENDANT:  Okay.  So it was from Monday, I dropped

16     them off, Monday night I dropped them off, and then my

17     arrangement with the babysitter, her name was (Inaudible at

18     12:25:51, low audio) and I was supposed to pick them up Friday

19     afternoon.  And so they have been with her from morning till

20     night.

21         THE COURT:  I'm confused.  So the children have been with

22     a third party from Monday through Friday, is that what you're

23     saying?  They were not with you at all?

24         THE DEFENDANT:  Yes, that's correct, because I work

25     during the day.  Normally they would have been in camp, and I

1   would have picked them up after work, from camp, but she

2   didn't want them going to camp.  So she told me to get a

3   babysitter, and so that was the arrangement that I could make

4   with the babysitter.

5       THE COURT:  So you did not see the children for an entire

6   week because they were with a babysitter; is that correct?

7       THE DEFENDANT:  I -- I was -- I spoke to them on the

8   phone, but that's about what I had.

9       THE COURT:  No, my question sir, sir, respectfully, my --

10  what I'm --

11      THE DEFENDANT:  There was only four days of that.

12      THE COURT:  Okay.  And what days were those, sir?  Look

13  at the calendar and tell me what days those were.

14      THE DEFENDANT:  Okay.  So Monday night.  Let me see here.

15      MR. CULLEN:  Was it the 27th, James, of April?

16      THE DEFENDANT:  I'm looking at my calendar.

17      MR. CULLEN:  Sorry to interrupt, Your Honor.  My

18  understanding was last week --

19      THE DEFENDANT:  Oh, yes, that was -- that was April 27th

20  until May 1st when I picked them up on Friday afternoon.

21      THE COURT:  Okay.  And that was also not in accordance

22  with the orders of the Court; is that correct, sir?

23      THE DEFENDANT:  It wasn't mentioned in Court, no, because

24  originally I wouldn't have had the children at all because

25  they would have been under Amanda's care, but she -- she gave

1  them to me, in a -- in an agreement that I would take them,

2  through email.

3      THE COURT:  But I don't believe that my order indicated

4  that there was room for variation.  I'm looking.  It said,

5  "The parties shall continue with the present parenting

6  schedule.  The Court will make no changes to custody at this

7  time."  Both parties elected to -- to change that.

8      THE DEFENDANT:  She offer -- she offered to do that.  And

9  she agreed to do that.

10      THE COURT:  Thank you, sir.

11      THE DEFENDANT:  That was on Amanda.

12      THE COURT:  But the Court sees it slightly different,

13  sir.  The Court sees that the parties elected to vary the

14  order of the Court.

15      Counsel, what does your client want to see happen today?

16      MR. CULLEN:  He would -- he would like to maintain

17  custody of the children.  We're certainly agreeable to

18  Facetime every day, at a designated time with mother, so

19  mother can have Facetime, and we're also willing to do

20  parenting time for mother on the weekends.  But we do not

21  want, as Your Honor has already stated, Brian Botelho near the

22  children.

23      THE COURT:  And -- and, counsel, will your client be

24  having the children or will they be staying with a third party

25  babysitter?

1        MR. CULLEN:  If mother will agree to -- DCF has set up a
2    YMCA daycare program for the children from between 9 and 5
3    during the week.  If the children are able to do that, the
4    children then will be residing with my client the rest of the
5    time.
6        THE COURT:  Otherwise, they'll be living with a third
7    party?
8        MR. CULLEN:  No, they will not be with a third party.  If
9    they're with the daycare program during the day, they will be
10   with no other party, they'll be with -- with father.
11       THE COURT:  Right.  But if the mother does not agree to
12   that, then the children will be with a babysitter; is that
13   correct?
14       MR. CULLEN:  Yes, Your Honor.
15       THE COURT:  All right.  And, ma'am, what purpose do you
16   believe is served by the children staying with the father and
17   being with a babysitter or being in daycare?  Are you able to
18   watch them during the week?
19       THE PLAINTIFF:  Yes.
20       THE COURT:  So why --
21       THE PLAINTIFF:  Can I add in a few things to these
22   comments?
23       THE COURT:  No, answer my question.
24       THE PLAINTIFF:  Yup.
25       THE COURT:  Why would -- see this is -- the problem that

1    has occurred is when the Court issues orders, and instructs
2    the parties to engage in certain behaviors, and then when the
3    parties elect to do something differently, we end up in
4    circumstances such as these, which is not what I had
5    anticipated.  So, ma'am, are you able to watch the children
6    during the day?
7         THE PLAINTIFF:  Yes.
8         THE COURT:  All right.  And, ma'am, since the children
9    have been with the father, how many days during that time
10   period has your boyfriend been present at your home?
11        THE PLAINTIFF:  He hasn't, but I just -- I can't say, you
12   know, I have to -- I actually have to talk to him, because,
13   you know, I'm pregnant now and I just can't agree to have him
14   blocked because we got into an argument.  He's -- you know, I
15   guess I can't go along with that.
16        THE COURT:  So you're not able to have the children --
17   you're not able to agree at this particular point in time that
18   your boyfriend will no longer be in the home?
19        THE PLAINTIFF:  Well, I'm -- I'm working with DCF through
20   that, so when they feel like it's okay, maybe therapy or
21   whatever, you know, then we can talk about it with them.  But
22   I'm kind of going through them, and leaning on them quite a
23   bit to, you know, do the right thing every step of the way.
24        THE COURT:  And what is your concern, ma'am, about the
25   YMCA day program?

1      THE PLAINTIFF:  You know, when -- James didn't talk to me

2  about this beforehand.  I found out after the fact when he had

3  already promised the kids that, you know, they could go.  And

4  my concern was the Corona Virus, and there's no -- there's no

5  vaccine out yet, and, you know, to find out like that, and not

6  even be able to talk to him about it, not be able to, you

7  know, go to some of my friends that are nurses and see what

8  they think, I -- you know, I panicked.  I'm, like, this is --

9  how could you put this on me like this?  You know, like why

10  would you talk to them about it before me?  And, you know, I

11  just -- I am concerned over it, but, you know, I am kind of

12  torn with it to be honest.  Torn with the idea of it.

13      THE COURT:  And counsel representing the father.  The

14  babysitter's home where the children have been staying, how

15  many other third parties are present in that home?

16      MR. CULLEN:  that I -- I actually do not know, Your

17  Honor.  James, can you answer that question regarding --

18      THE DEFENDANT:  Yes, she -- yes, --

19      THE COURT:  You may answer that question, sir.

20      THE DEFENDANT:  It's just her husband, that's it.

21      THE PLAINTIFF:  I can answer it.  She's like a mother to

22  me, she's very close to me.  She has her husband, Rafael

23  Arboleda, that lives with her.

24      THE COURT:  So you know this person then?

25      THE PLAINTIFF:  I know her since I was six years old, and

1     he wouldn't tell me who the babysitter was because of -- she
2     supposedly said because of my history of mental instability,
3     and that's why I sent the Court the exhibits of my
4     relationship with her.  She's watched them for me, you know --
5     you know, this year quite a few times.  And, you know, we're
6     really close.  So I don't under -- you know, there's -- and
7     then this week she's -- this week he actually --
8          THE COURT:  Just one moment, please.
9     (Discussion off the record.)
10         THE COURT:  Have we been disconnected?  Is anyone --
11         THE PLAINTIFF:  I'm here.
12         THE COURT: -- able to hear me?  All right.
13         THE PLAINTIFF:  I can hear you.
14         THE DEFENDANT:  I'm here.  Father is here.
15         THE COURT:  Who else is present on the line?
16    (Discussion off the record.)
17         THE COURT:  Sessions Clerk Davis, are you present?
18         THE CLERK:  I am, Judge.
19         THE COURT:  I think what may have happened -- all right.
20         THE CLERK:  Judge, yes, I am here.
21         THE COURT:  I think what may be happening -- I think what
22    may be happening is we're going over almost our anticipated
23    half hour, and there are other --
24         THE CLERK:  That's exactly --
25         THE COURT:  -- hearings that are waiting.  So we're going

1    to have to be able to wrap up, or the other party is going to

2    have to wait.

3          What I'm concerned with, is the parties elected to vary

4    from the orders of the Court, and now we're in somewhat of an

5    untenable situation with the children.  As I see it, from the

6    information I've gathered, the children are staying with a

7    third party who the mother knows, but who is not permitting

8    the mother to have access to the children.  And the mother

9    apparently is not --

10         I'm not exactly sure how we're going to be able to manage

11   this, but we'll do our best.  This is a public hearing as it

12   would have taken place during open Court hours anyway.

13         But mother, I'm concerned that you're not able to

14   represent that the children can be with you, because you're

15   addressing your relationship with your current boyfriend and

16   the fact that you're now expecting.  So I'm very concerned

17   about how we're going to able -- be able to resolve this in

18   the best interest of the children, because their concern and

19   their best interest is really paramount to this Court.

20         So what do you suggest happen, mother?

21         THE PLAINTIFF:  Well, honestly, you know, DCF emailed me

22   and they've been talking with Brian and they, you know,

23   according to them, I can pull up the email and read it for

24   you, but they think he's very, very supportive and, you know,

25   going forward, they want to, you know, whatever therapy or

1    anything that we have to get through, they want to, you know,

2    include him on it.  So he's -- he's actually working strongly

3    with DCF, I guess he talked to them for quite a bit, and they

4    have -- they've said good things about him.

5        THE COURT:  And that certainly --

6        THE PLAINTIFF:  I think I should continuing doing that.

7    As far as the kids go, honestly what I think should happen, is

8    that if they want -- if they want to live with their father,

9    I'm in support of that.  What I'm not in support of is if, you

10   know, them not -- them being obligated to this type of huge,

11   massive change without a trial run, because they have to have

12   the ability to stay there, see what it's actually like, and

13   then see how they feel about it, because I don't know that.

14       THE COURT:  But ma'am -- ma'am -- ma'am, I'm going to

15   interrupt you.  The Court does not permit the children to make

16   the decisions.  Right now what I have --

17       THE PLAINTIFF:  Right.  Right.

18       THE COURT:  -- from your perspective -- just please

19   listen, ma'am.  What I have from your perspective, ma'am, is

20   that you're at home with no children, but able to care for the

21   children.

22       THE PLAINTIFF:  Right.  Yes.

23       THE COURT:  But you are, to a certain extent, not

24   accepting of the fact that your boyfriend is not able to be

25   present.

1      Then what I have is the father working fulltime, and

2  therefore not able to watch the children and then being

3  required to delegate the children's care to a third party, so

4  the children end up spending time with a third party because

5  they're not going to the daycare, which I respect your

6  concerns regarding that.

7      And so we're left with the children living with neither

8  parent and staying with a third party, which is not what the

9  Court had ordered.

10      THE PLAINTIFF:  Right.

11      If I were --

12      THE COURT:  So counsel -- ma'am -- ma'am, I'm going to

13  hear form counsel.

14      What do you suggest, counsel?

15      MR. CULLEN:  I think it's in the best scenario -- case to

16  have temporary, physical custody with father.  The children

17  are currently with the paternal [sic] grandmother, so mother's

18  mother, so if we either do the YMCA during the day, or have

19  the mother's mother -- the maternal grandmother watch the

20  children during the day, and my client can then pick the

21  children up.

22      THE COURT:  And mother, is your mother able to watch the

23  children during the day, and how old is she?

24      THE PLAINTIFF:  My mother is about, you know, sixty-five,

25  and I'm not sure how much she can watch them during the day.

1    If -- if we did this temporarily --

2         THE DEFENDANT:  She works full time.

3         THE PLAINTIFF: -- how temporarily would it be before we

4    could reevaluate, because, you know, I know the kids don't

5    make the decisions, but I'd like their feedback and see how

6    they feel about things, and I'd also, if they were to go

7    there, I want way more Facetime.  I got about thirty minutes

8    in a week.

9         THE COURT:  So what I'm -- what I'm determining, ma'am,

10   based upon what I'm hearing from you, is that you do not wish

11   to have the children living with you in your home on a

12   fulltime basis at this particular point in time; is that

13   correct?  Because you're addressing both circumstances

14   associated with your recent pregnancy and the father of that

15   child; is that correct?

16        THE PLAINTIFF:  No, I would wish them to be with me, but

17   I also want to -- them to have the chance to see what it's

18   like to live with their father.  I think they deserve the

19   opportunity to just see what it's like, but it's -- you know,

20   that to me is,  you know, I would like it to be temporary so

21   that way they can see what it's like, see how they feel about

22   it, see if it works out with coparenting and that sort of

23   thing, and then reevaluate, you know, how it went at a later

24   date.  And if -- if we did do this, you know, he -- only

25   because he's only giving me thirty minutes of Facetime during

1    the whole week.  I want like an hour a day of Facetime, and,

2    you know, I want them to be able to have access to me, and I

3    want to know where they are.

4         THE COURT:  And counsel representing the father, is your

5    client able to work with the babysitter and the maternal

6    grandmother to determine if they might be able to provide

7    babysitting services for the children?

8         MR. CULLEN:  He can.  He's actually the one that arranged

9    for both the babysitter and the paternal grandmother to watch

10   the children.

11        THE COURT:  Say that again, sir?

12        THE PLAINTIFF:  I don't want the babysitter --

13        THE COURT:  Ma'am -- ma'am, do not interrupt.

14        THE PLAINTIFF:  Sorry.  Sorry.

15        THE COURT:  Because quite frankly, ma'am, your -- your

16   actions have complicated the matter in a way that the Court

17   had not previously anticipated, especially when the Court is

18   addressing parenting time during a global pandemic.

19        THE PLAINTIFF:  Sorry, I didn't realize that.

20        THE COURT:  So could you please finish your statement,

21   counsel?

22        MR. CULLEN:  My client was the one that arranged the

23   babysitter and the maternal grandmother, so he can continue to

24   do so, Your Honor.

25        THE DEFENDANT:  No, I cannot.  I need to have the daycare

1  only with the YMCA.

2        THE COURT:   The camp?

3        THE DEFENDANT:   Yes.

4        THE COURT:   So, counsel, do you wish to clarify for the

5  Court what your client's position is?

6        MR. CULLEN:   Yes, Your Honor.   I misspoke.   I guess my

7  client is only to have the children fulltime if the children

8  are able to go to the DCF sanctioned YMCA Club during the day.

9        THE COURT:   And you're opposed to that, ma'am; is that

10  correct?

11        THE PLAINTIFF:   You know, I -- after thinking about it, I

12  -- you know, I feel like -- I'm more open to it now.

13        THE COURT:   All right.   This is what I'm going to do.

14  Both -- this is what I am going to do.   There is no active

15  restraining order in this case; is that correct, ma'am, yes or

16  no?

17        THE PLAINTIFF:   Correct.

18        THE COURT:   Sir, is that correct, counsel, yes or no?

19        MR. CULLEN:   Yes.

20        THE COURT:   All right.   So I have other people waiting.

21  I will tell you that I'm extremely disappointed that the

22  parties would not have had any interaction to discuss these

23  very important matters prior to the hearing today.   So what

24  I'm going to do today, is I'm going to conclude this hearing

25  right now, but I have two other hearings and I'm going to have

1    you folks call back at 2 o'clock today, and that's when the

2    Court will make its decision because you need -- you both need

3    to have an extremely thorough conversation, and to the best of

4    your efforts come to a very specific agreement, if possible.

5    And, counsel, I'll rely upon you to articulate that, all

6    right?

7          MR. CULLEN:  Your Honor, can we do 3 o'clock?

8          I have a 2 o'clock -- can we do 3 o'clock?

9          THE COURT:  I'm going to -- I'll do 3 o'clock, but I will

10   tell you how disappointed I am of the lack of preparedness of

11   both parties coming forward today without having discussed

12   this matter concerning these children.  So I'm going to

13   continue this matter until 3 o'clock.

14         Do you understand that, ma'am?  Are you able to

15   participate in the hearing at 3 o'clock?

16         THE PLAINTIFF:  Yes.

17         THE COURT:  And, counsel, are you and your client able to

18   participate in the hearing at 3 o'clock?

19         MR. CULLEN:  Yes.  Right, James?

20         THE DEFENDANT:  Yes.

21         THE COURT:  All right.  Is that -- sir, you need to

22   answer yes or no for purposes of clarity of the record,

23   because, "Yeah," doesn't necessarily provide me with the

24   information I need, so is that a yes, sir?

25         THE DEFENDANT:  Yes.

```
1         THE COURT:  Your response is yes, yes or no, sir?
2         Counsel, could you instruct your client to answer yes,
3    Y-E-S, or no, N-O?
4         MR. CULLEN:  Yes, Your Honor.  James, can you state yes,
5    please?
6         THE DEFENDANT:  Yes, I'm -- yes, I'm sorry, I'm saying it
7    the best I can, yes, I can.
8         THE COURT:  All right.  Thank you.  So I'm going to
9    conclude the hearing now, and you will all dial in again at 3
10   o'clock, and I expect you to have had a thorough conversation
11   of all options.  All right?
12        THE PLAINTIFF:  Thank you.
13        THE DEFENDANT:  Thank you, Your Honor.
14        THE COURT:  Thank you, we'll conclude the hearing until
15   that point.
16        And Sessions Clerk Davis, would you kindly conclude this
17   call and then we'll pick up the next hearing, all right?
18        THE CLERK:  Very good.  Thank you.
19        THE COURT:  Thank you.
20   (Recess taken.)
21        THE COURT:  Good afternoon, this is Judge Black in the
22   Essex County Probate & Family Court.  I'm having a second call
23   on the DiCrescenzo matter, Docket Number 16D0970.
24        Is Sessions Clerk Davis present?
25        THE CLERK:  I am.  Thank you, Judge.
```

1      THE COURT:  Thank you.  And I'm going to ask the parties

2  to identify themselves beginning first with the mother.

3  Please identify yourself for the record, ma'am.

4      THE PLAINTIFF:  Amanda DiCrescenzo.

5      THE COURT:  Thank you.  And father, please identify

6  yourself for the record.

7      THE DEFENDANT:  James DiCrescenzo.

8      THE COURT:  Thank you.

9      And, counsel, on behalf of the father, your name for the

10  record?

11      MR. CULLEN:  James Cullen, C-U-L-L-E-N.

12      THE COURT:  Thank you.  The parties were sworn this

13  morning, so their statements continue to be under oath.

14      When we broke from the morning session, I indicated the

15  parties should discuss the issues that were pending, and

16  counsel I'll ask you first, what is your understanding of the

17  current status, and was there the possibility of reaching a

18  mutual resolution?

19      MR. CULLEN:  We did discuss, me and Amanda spoke on the

20  phone at 12 o'clock.  There will be no agreement.  Mother

21  wants -- the only thing mother would be aggregable to is if

22  there's coparenting between herself; her boyfriend, Brian

23  Botelho; father; and father's current wife.  That would be the

24  only thing she is currently agreeable to.  She wouldn't --

25      THE COURT:  I'm going to ask --

1      MR. CULLEN:  She wouldn't discuss custody.

2      THE COURT:  Counsel, I'm just going to interrupt you.

3  Please make sure that you have your phone on a secure place

4  and on speaker phone and there is no background noise because

5  I'm getting some type of background noise which is impacting

6  my ability to hear what's being said.

7      I understand, counsel, from your representations that

8  mother wants coparenting to include mother, mother's

9  boyfriend, father and father's wife.  Is that correct?

10     MR. CULLEN:  Correct.

11     THE COURT:  And what does your client want?

12     MR. CULLEN:  My client wanted to pick up the -- the

13 parties are -- Amanda has stated --

14     THE COURT:  I'm not able to -- counsel, I'm sorry to

15 interrupt you.  There's some type of background noise.  I'm

16 not able to understand you.  It's interfering with the -- it

17 sounds like --

18     MR. CULLEN:  Can you hear me better now?

19     THE COURT:  I can hear you better now.  Thank you.

20     MR. CULLEN:  Father wishes to have physical custody of

21 the children during the week.  Mother, during our morning

22 session, had stated that she didn't have issues with DCF day

23 camp.  We didn't discuss that at 12 o'clock.  Father would be

24 agreeable to have -- mother having parenting time on the

25 weekend, and we were willing to give her thirty minutes of

1   Facetime every day at 7 p.m.  That's what I had brought up to

2   mother.  Mother wasn't agreeable to any of those, she only

3   wanted to do the coparenting therapy and she wanted to do that

4   for a month before she'd be willing to discuss any of those

5   issues.

6        THE COURT:  All right.  And -- thank you, counsel.

7   Mother, what would you like me to know?

8        THE PLAINTIFF:  Well, two things.  You know, I think

9   coparenting therapy is important, it could be just me and

10  James, it really doesn't matter to me.  I think having a

11  united front with me and James is more important than anything

12  right now, especially if such a huge trans -- transition

13  should occur.

14       The other thing that I do want to bring up is that in my

15  original objection to counterclaim back in November, I stated

16  under the communication with father and children that the lack

17  of it under phone calls, Facetime and so forth, has been

18  emotionally and mentally distressing towards them, to the

19  point where it has caused Ava to be depressed over the

20  rejection of her father.

21       So nothing from that has really changed since, you know,

22  the past week and a half he has had them, not as much as I

23  would have liked, but he did.  Knowing that information, he

24  didn't make changes and let that behavior go on knowing how it

25  affected Ava.  And for that reason, specifically, I'm -- I

1   would be very worried about them being in his care, especially

2   full time.

3       The other thing is --

4       THE COURT:  I'm going to interrupt you.  Will it impact

5   what you believe should happen if I tell you that I will not

6   be entering any order at this juncture that permits your

7   boyfriend to participate in any parenting time you have with

8   the children.

9       THE PLAINTIFF:  Oh, that's -- yeah, that's fine.  That's

10  fine.  I mean I was just -- my point was I was open to

11  whatever, you know, but, yeah, no it doesn't matter to me.

12      THE COURT:  Because earlier in the day, ma'am, my notes

13  reflected that that was not something that was going to be

14  agreeable to you based upon your disclosed pregnancy and your

15  relationship with your boyfriend.

16      THE PLAINTIFF:  Right.  And the other -- that's another

17  thing I wanted to bring up.  I --

18      THE COURT:  Ma'am, I'm going to interrupt.  I'm going to

19  interrupt you, respectfully.  I want to know what you believe

20  the parenting time to be, father has indicated he believes the

21  parenting time should be physical custody to the father during

22  the week, and parenting time with you on the weekend, and

23  Facetime with you once per day at 7 o'clock.  What do you

24  want?

25      THE PLAINTIFF:  I don't think that's in the best interest

```
 1    of Ava and Emma right now.
 2         THE COURT:  But, ma'am, -- ma'am --
 3         THE PLAINTIFF:  I would like -- what I would like --
 4         THE COURT:  Ma'am?
 5         THE PLAINTIFF:  Yeah.
 6         THE COURT:  We had difficulty in the first hearing.  I'm
 7    asking you a very specific question, and I respectfully ask
 8    that you answer it with specifics, not generalities.  What do
 9    you specifically want the parenting time to look like?
10         THE PLAINTIFF:  I would like it to be similar to what it
11    is now, but I would also like for, you know, some supervised
12    custody -- supervised visitation of some sort because --
13         THE COURT:  Ma'am, I'm going to interrupt you.  Ma'am,
14    are you asking that the father have supervised parenting time
15    with the children, yes or no?
16         THE PLAINTIFF:  Yes.
17         THE COURT:  All right.  So based upon that, ma'am, why
18    did you relinquish custody to him after my last Court order in
19    violation of the Court order?  Why did you do that?
20         THE PLAINTIFF:  Because I didn't know -- I didn't realize
21    that -- okay.  Because Ava, as we can see, like, in the --
22    visitation request, has been asking for her father over and
23    over again, and, you know, that's part of why I wanted him to
24    have more Facetime and phone time because she was really
25    getting depressed on it.  It was, like, it was killing her
```

1    inside, that rejection, and so I did it for her so she could

2    have the chance to see what it was like to live with her

3    father, and it didn't go very well.

4        THE COURT:  And specifically, ma'am, not generalities,

5    because most of the information you have provided has been

6    generalities, what specifically did not go well for Ava?

7        THE PLAINTIFF:  She had to sneak around her father to

8    talk to me.  She started whispering.  He kept her from me.

9        THE COURT:  But, ma'am, the problem that I'm unable to

10    overcome is you initiated those circumstances in violation of

11    the Court order.

12        THE PLAINTIFF:  Right.  Right.  Because I wanted -- she

13    has asked, she wanted to have that chance, and I -- and

14    because it didn't go very well for her, I saw her reaction,

15    especially today when I Facetimed her, and she -- I feel like

16    it gives her closure.

17        THE COURT:  Counsel representing the father, is Ava

18    currently in counseling?

19        MR. CULLEN:  That I do not know.  I know mother was --

20        THE COURT:  Ask your client.

21        MR. CULLEN:  James, do you know if Ava is in counselling?

22        THE DEFENDANT:  I believe that she is not because Amanda

23    was supposed to have done that, the last hearing that we had,

24    Amanda was supposed to do that.

25        THE COURT:  Mother, what steps --

1       THE DEFENDANT:  But I agree, Ava does -- Ava does need
2  counseling.
3       THE COURT:  Thank you, sir.
4       Mother, what steps have you taken to place the child into
5  counselling?
6       THE PLAINTIFF:  I've been working with DCF, and I have
7  two appointments set up for Ava, one on the 12th and one on
8  the 18th with Elliott -- Elliott something, I can't remember
9  the exact name.
10       THE COURT:  And what happened -- what happened to those
11  appointments?
12       THE PLAINTIFF:  Oh, no, they're coming -- they're
13  upcoming.
14       THE COURT:  What were the dates?  I'm sorry.
15       THE PLAINTIFF:  The 12th, I believe, and the 18th.
16       THE COURT:  And are those video conferences, or in-
17  person?
18       THE PLAINTIFF:  Yes.
19       THE COURT:  I'm assuming they're video?
20       THE PLAINTIFF:  Yes, they're video because they want to
21  see the entire house and everything.
22       THE COURT:  Did you give that information to the father?
23       THE PLAINTIFF:  Maybe I didn't.
24       THE DEFENDANT:  No.
25       THE PLAINTIFF:  But I -- you know, it was done through

1   DCF, I kind of figured he knew because I figured -- you know,

2   I just -- I just -- I'm sorry.

3        THE COURT:  So, ma'am, do you think the children should

4   be returned to you today?

5        THE PLAINTIFF:  They're with my mother right now, and I

6   plan on picking them up tomorrow.

7        THE COURT:  Why?  Why are they with a third party?

8        THE PLAINTIFF:  Well because this Court date was today,

9   and I don't want them overhearing anything.

10        THE COURT:  But why are they staying over a third party's

11   home?

12        THE PLAINTIFF:  Well, James put her in like -- in my

13   mother's care on Monday, and so I mean they -- they love my

14   mother and they adore my mother, and I've been Facetiming them

15   all the time.  And they're having a great time over there.  So

16   --

17        THE COURT:  But, ma'am, you told me earlier you didn't

18   believe --

19        THE DEFENDANT:  If I -- if I may speak?

20        THE COURT:  No.  You didn't believe your mother would be

21   able to commit to ongoing caregiving of the children.

22        THE PLAINTIFF:  Right.

23        THE COURT:  And, counsel, what did you want to say?

24        MR. CULLEN:  That -- that was actually my --

25        THE COURT:  Was that you, counsel, or was that the

1    father?

2         MR. CULLEN:  That was father.

3         THE DEFENDANT:  that was -- that was me.  Yeah.

4         THE COURT:  What do you want to say?

5         THE DEFENDANT:  Last -- last night, I wanted to pickup --

6    yes, last night I wanted to pick up Ava and Emma, but Amanda

7    said no, that she didn't want me to, and she wanted them to be

8    kept with her mother instead.   And she was breaking up my

9    arrangement with her mother, because she didn't like the way I

10   was communicating with her the last two weeks, and the reason

11   why she feels the way that she does is because she's been

12   texting me over eighty times asking to talk to the girls, when

13   they weren't even in my care.  They were under the

14   babysitter's care, so I couldn't make her talk to them when

15   they were under the babysitter's care.  And so she sent the

16   police over to my house, and then -- and then the police

17   verified that the kids weren't here at my house.  So she's

18   been harassing me the last two weeks with that.

19        THE COURT:  This is what's very concerning to me.  I made

20   an order, and the parties elected to not -- not abide by it,

21   and as a result, we're in the current circumstances, where

22   since my last order, the children seem to have been in the

23   custody of a third party more than they have been in the

24   custody of a parent.  Is that correct, counsel?

25        MR. CULLEN:  That is correct, Your Honor.

1    THE COURT:  And that situation cannot go forward.  It

2    seems to me, ma'am, that you elected to bypass my order and

3    place the children in the father's custody, and that I also

4    reviewed information that indicated when the father picked the

5    children up, that your boyfriend was present.  Is that

6    correct?

7    THE PLAINTIFF:  He was not present.

8    THE COURT:  Is that correct, counsel?

9    MR. CULLEN:  Yes, James, you said Mr. Botelho was --

10   THE DEFENDANT:  Yes.  Yes, he was.

11   THE PLAINTIFF:  Oh, no, that's crazy, he wasn't.

12   THE COURT:  What day was that, sir?

13   THE DEFENDANT:  That was April 24th.  Or 23rd.  It was a

14   Thursday.  The 23rd of April.

15   THE COURT:  And you say that that's not true, ma'am?

16   THE PLAINTIFF:  James has a history of lying under the

17   dentist thing you can already see that.

18   THE COURT:  Ma'am, that is not the --

19   THE PLAINTIFF:  No, that is not true.

20   THE DEFENDANT:  I have a text message from Ava, proving

21   that, from her phone.

22   THE COURT:  All right.  So, ma'am, the type of parenting

23   --

24   THE DEFENDANT:  That said he was there.

25   THE COURT:  The type of -- the type of therapy that you

1    have arranged, how is it supposed to happen?

2         THE PLAINTIFF:  Well, I believe it's video conference,

3    and I talked to Brian at DCF, I believe it's video conference,

4    or telephonic.

5         THE COURT:  Who set it up, DCF or you?

6         THE PLAINTIFF:  DCF.  DCF.  Well I set up the

7    appointment, they -- they -- like they got me setup with the

8    place itself.

9         THE COURT:  Father, who resides in your home?

10        THE DEFENDANT:  My wife, Kerry, and her son, Steven.

11        THE COURT:  And how old is Steven?

12        THE DEFENDANT:  Steven is 27.  He's my -- my in-law

13   pretty much.  He's in an in-law apartment.

14        THE COURT:  He's in an in-law apartment?

15        THE DEFENDANT:  My -- my stepson, Steven, yes, he's in an

16   in-law apartment on the first floor.

17        THE COURT:  All right.  Does your wife work outside of

18   the home, sir?

19        THE DEFENDANT:  My wife does work outside the home.

20        THE COURT:  Where?

21        THE DEFENDANT:  She's in -- she works in Lynnfield.

22        THE COURT:  Where?

23        THE DEFENDANT:  IEF Incorporated.

24        THE COURT:  And what is that?

25        THE DEFENDANT:  It's an environmental solutions, for

1   environmental -- environmental company.

2       THE COURT:  And your -- the type of your -- your type of

3   employment, sir?

4       THE DEFENDANT:  I work for the -- Cambridge DPW.

5       THE COURT:  Specifically doing what?

6       THE DEFENDANT:  I'm in the carpentry department.

7       THE COURT:  And what are you doing now during the Covid

8   pandemic?

9       THE DEFENDANT:  Right now I'm on call for emergencies.

10  So every day I have to -- I have to basically just be on call,

11  and when they call me, I go in.  And then when they're done

12  using me, I -- they send me back home.  And what we've been

13  doing is working on hospitals.  Lately we've been working on

14  hospitals in Cambridge, setting up beds and walkways for the

15  Covid 19 problem.

16      THE COURT:  And is your wife currently working, does she

17  go to work during this?

18      THE DEFENDANT:  My wife goes back and forth from work, so

19  sometimes she works from home, and sometimes she goes into the

20  office.

21      THE COURT:  And if you were to have custody -- physical

22  custody of the children during the week, what would that look

23  like?

24      THE DEFENDANT:  Well DCF already offered to have

25  childcare for me for up to a year, until I am better situated.

1   But it's usually dropping them off from 8 to 4, Monday through

2   Friday.  And my wife would be able to pick them up.

3        THE COURT:  And --

4        THE DEFENDANT:  Hello?

5        THE COURT:  -- are you able to negotiate any caregiving

6   with either a babysitter that you had referenced before that I

7   understand is known to the mother, or the maternal

8   grandmother?

9        THE DEFENDANT:  Yes, that's possible.  I mean they're all

10  willing to help me they told me.  So, yes, I have --

11       THE COURT:  But why -- why --

12       THE DEFENDANT:  -- I have babysitters that --

13       THE COURT:  Let me just interrupt you, sir.  If the

14  babysitter or the grandmother watch the children, why would

15  they need to sleep over that location?

16       THE DEFENDANT:  Because they're an hour away.  Her mother

17  is an hour away from where I live.  And she -- and her mother

18  offered to keep them overnight.  It wasn't something like --

19  that she had to do.  I mean I could have gone and picked them

20  up and brought them back home, but she wanted to keep them for

21  a few days.  She was only supposed to keep them from Monday

22  till Wednesday, and then I was supposed to pick them up.

23       THE COURT:  Who is she?  The grandmother?

24       THE DEFENDANT:  Amanda didn't want me to pick them up

25  from her mother.

1        THE COURT:  Sir --

2        THE DEFENDANT:  The grandmother.  That's Amanda's mother.

3        THE COURT:  So the grandmother wanted to keep them for a

4   few days; is that correct?

5        THE DEFENDANT:  Yes.

6        THE COURT:  All right.  Now mother, you want the children

7   returned to you and you are not going to have your boyfriend

8   present, and you want the father to have supervised parenting

9   time; is that correct?

10        THE PLAINTIFF:  Well actually I spoke to DCF this

11   morning, and they said that they can -- to ask you for an

12   order to disclose because they actually said that they've been

13   working with Brian, and that they resolved any concerns that

14   they had about him, and that he's willing to do in-home

15   therapy and individual therapy, so that order I would like

16   striked.

17        THE COURT:  So, ma'am, that was not the question.

18        THE PLAINTIFF:  Well eventually, like maybe in a month,

19   but.

20        THE COURT:  Ma'am --

21        THE PLAINTIFF:  But, you know, he is still working with

22   DCF.

23        THE COURT:  Ma'am -- ma'am, I appreciate the fact that

24   you're working with DCF, but that wasn't my question.  And

25   I've already told you today that I will not be entering any

1   order that includes your boyfriend's presence in the home at

2   this time.

3        THE PLAINTIFF:   Okay.

4        THE COURT:   So do you want the children to reside with

5   you, and have supervised parenting time with the father,

6   that's what you said earlier.

7        THE PLAINTIFF:   Yes.

8        THE COURT:   Is that what you want?

9        THE PLAINTIFF:   Yes.   Yes.

10        THE COURT:   Okay.

11        Father, when was the last time you spoke with the

12   Department of Children and Families?

13        THE DEFENDANT:   I spoke with Brian yesterday.

14        THE COURT:   And what did you speak with him about?

15        THE DEFENDANT:   I told him how the arrangements that I

16   had made with Amanda were -- were -- were being taken away.   I

17   told him, you know, that I was -- that Amanda was going to be

18   taking the girls, and breaking the arrangement that I had with

19   her because she didn't like that the girls weren't calling her

20   every day, even while they weren't in my care.   So that's what

21   I talked to Brian about, and he told me that -- to basically

22   let Amanda do what she wants to do, and take the girls if

23   that's -- if that's what she's still insistent in doing, and

24   so I told her anytime that she wanted to take the girls back

25   during those two weeks, that she could.   She could take them

1   back anytime that she wanted, but she still, over the last two

2   weeks, texted me eighty different times and she still, even

3   though she was all worried and -- and -- about the children

4   that she claimed, she still never picked them up from me, and

5   she still hasn't picked them up from her mother yet even.  So

6   that's what I talked to Brian at DCF about.

7         THE COURT:  And what did you understand his response to

8   be?

9         THE DEFENDANT:  What did I understand Brian?  Well --

10        THE COURT:  What did you understand the DCF response to

11  your concern?

12        THE DEFENDANT:  He's waiting for the Court's decision,

13  that's what he's waiting for.  That's his response.

14        THE COURT:  So --

15        THE DEFENDANT:  And I've been keeping up-to-date with him

16  about -- about my Court situation, so that's what he's been

17  telling me to do.

18        THE COURT:  So father, if I was to enter an order that

19  you have physical custody of the children during the week,

20  would you be able to facilitate their sleeping in your home

21  every night?

22        THE DEFENDANT:  Yes.  I have -- they have -- they both

23  have their own bedrooms, so that's fine.

24        THE COURT:  But they would not be staying at any third

25  party caregivers' home.

1    THE DEFENDANT:  No, they wouldn't.

2    THE COURT:  Because what I'm very concerned --

3    THE DEFENDANT:  They'd only be using -- I'd only be using

4    DCF care, they wouldn't be -- I wouldn't have them sleeping

5    over anybody else's house.  They'd be -- it would be under my

6    -- my house, and the only care that I would have is during the

7    day when I'm actually working.

8    THE COURT:  And what about when your wife isn't working,

9    is she able to watch them?

10   THE DEFENDANT:  Yes, she is.

11   THE COURT:  And how often do you anticipate that would

12   happen?

13   THE DEFENDANT:  About three times a week my wife would

14   probably be available for it.

15   THE COURT:  Let me ask you this.  Do you have to -- in

16   order to take advantage of the DCF daycare, does it have to be

17   a five day commitment or can it be less than that?

18   THE DEFENDANT:  They -- well they were offering me five

19   days commitment.

20   THE COURT:  But are you able to elect less than that?

21   THE DEFENDANT:  Probably not.

22   THE COURT:  And why is that?

23   THE DEFENDANT:  Because we don't know the schedule of the

24   week yet, or -- or from when, or from week to week.  I need to

25   be able to put them on a schedule from week to week in order

1    to understand how that is going to work.

2         THE COURT:  But what has happened, ma'am, that concerns

3    me most is you have interjected a lot of irregularity into the

4    schedule that the Court previously had in mind, and as a

5    result, the children have been out amongst third party

6    caregivers for most of the last couple of weeks.  And it's

7    unfortunate that you elected to do that.

8         THE PLAINTIFF:  I realize that now.   I realize that.

9         THE COURT:  And the children need to have regularity, and

10   as to the parents, have not done what I think is necessarily

11   to have that regularity achieved.  I respect the fact that the

12   father has to work, but ma'am, I do not find credible your

13   representation that you would not include your boyfriend in

14   these circumstances based upon your actions since my last --

15        THE PLAINTIFF:  What do you mean?

16        THE COURT:  Pardon?  I'm not able to hear you, there's

17   background noise somewhere, I'm not sure where it's coming

18   from.  What did you say, ma'am?

19        THE PLAINTIFF:  I just didn't understand what you meant.

20        THE COURT:  I don't believe that your boyfriend would not

21   be present.

22        THE PLAINTIFF:  Okay.

23        THE COURT:  And I'm -- my interpretation of the

24   situation, is that your prioritizing your relationship with a

25   third party over your responsibilities to your children.

1       THE PLAINTIFF:  No, I wasn't at all.  James wanted to

2  take the kids, and Ava has been begging me since -- for almost

3  a year now to -- to see what it's like to live with her

4  father, and so I -- I thought this was a great opportunity to

5  do that.  I didn't know he was going to send them somewhere,

6  and I wasn't going to know where they were.  At first I was

7  told it was Monday night to Wednesday, and then I found out

8  later it was till Friday.  Hello?

9       THE COURT:  Yes, I'm -- I'm drafting my order.

10      THE PLAINTIFF:  Sorry.

11      THE COURT:  So that I can tell you what I am going to do.

12      Counsel, do you have any concluding remarks that you wish

13  to make?

14      MR. CULLEN:  I do not, Your Honor.

15      THE DEFENDANT:  May I say something?

16      THE COURT:  Very briefly, sir.

17      THE DEFENDANT:  Yeah, I just want to make sure that they

18  have stability, and that they get the help that they need.

19      THE PLAINTIFF:  I've always been there.

20      MR. CULLEN:  Your Honor, if I may, there's -- if you are

21  inclined to change custody, I would also mention there is

22  child support that is not paid through DOR.  That my client

23  pays to mother.

24      THE COURT:  And how much is that?

25      THE DEFENDANT:  That's $200 a week.